UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------

FR 8 SINGAPORE PTE. LTD.,

                         Plaintiff,

           -against-

ALBACORE MARITIME INC. and PRIME
MARINE CORP., PRIME MARINE
MANAGEMENT INC. and PMC HOLDING INC.
d/b/a PRIME MARINE HOLDINGS INC.,

                       Defendants.

10 Civ. 1862 (RJH)

**MEMORANDUM OPINION
AND ORDER**

------

Richard J. Holwell, District Judge:

      Plaintiff FR 8 Singapore Pte. Ltd. ("FR8") commenced this action on March 9, 2010 against defendants Albacore Maritime ("Albacore"), Prime Marine Corp., Prime Marine Management Inc., and PMC Holding Inc. (collectively, the "Prime Defendants") to compel the Prime Defendants to arbitrate FR8's claims in London as alter egos of Albacore. Defendants have moved to dismiss the complaint **[11]** for lack of subject matter jurisdiction, on *forum non conveniens* grounds, and for failure to state a claim under Fed. R. Civ. P. 12(b)(6). The Prime Defendants also moved to stay discovery pending resolution of the motion to dismiss, while FR8 cross-moved to compel discovery **[15]**. For the reasons that follow, the Court DENIES the motion to dismiss for lack of subject matter jurisdiction, DENIES without prejudice the motion for failure to state a claim, and DENIES the cross-motion to compel discovery.

1

## BACKGROUND

For the purposes of this opinion, the following facts are taken as true.

On April 14, 2008, Albacore, a Marshall Islands corporation, entered into a Memorandum of Agreement ("MOA") to purchase the Marshall Islands' flagged vessel Overseas Reginamar from FR8, a Singaporean company. Albacore had been created twelve days earlier, on April 2, 2008, for the sole purpose of purchasing and chartering the vessel. (Suanes Decl. ¶ 4.) A company called AMC Holding Inc. owns Albacore; another called CLRT Holding owns AMC Holding Inc.; and CLRT Holding is owned by Prime Marine Corporation ("Prime"). (Compl. ¶¶ 33, 35, 36.) Prime is wholly owned by PMC Holding Inc. (Compl. ¶ 30.) All of the companies in the Albacore line of ownership are Marshall Islands companies, and their corporate books are located in Greece; Prime and PMC Holding Inc.'s principal offices are in Greece as well. (Compl. ¶¶ 7, 8, 33, 35; *see* Suanes Decl. ¶ 13.) Prime Marine Management ("Prime Management"), a Liberian company under Prime's control, serves as manager of the several shipowning companies ultimately owned by Prime, including Albacore. (Compl. ¶ 16, 31; Suanes Decl. ¶ 9).

Stathis Topouzoglou ("Topouzoglou"), a resident of Greece and one of Prime Management's directors, handled the negotiations for the defendants leading up to the MOA, along with the Prime Defendants' Greek counsel. (Suanes Decl. ¶ 9; Woods Decl. ¶ 5.) Roger Woods ("Woods"), a broker with FR8 Shipbrokers Ltd., whose primary office is in London, handled FR8's negotiations. (Woods Decl. ¶ 4.) In a March 28, 2008 e-mail, Woods provided a March 31 deadline to Topouzoglou by which the buyers' board of directors was to agree to the proposed terms of the MOA. (Bamford Decl. ¶ 6, Ex. 1.) Topouzoglou replied on March 31, 2008, indicating that the buyers' board of directors had approved the transaction. (*Id.* ¶ 7.) On

April 1, 2008, Woods informed Topouzoglou that FR8's board of directors had also approved the transaction, and requested that Topouzoglou "advise the correct name of [the] company for the [MOA]." (*Id.* Ex. 3.) Another Prime Management employee, Michael Chalkias, informed FR8 on April 2, 2008 that the buyer would be Albacore, which had been incorporated that day. (*See id.* Ex. 4; Suanes Decl. ¶ 4.) Albacore and FR8 executed the MOA on April 14, 2008. (Suanes Decl. ¶ 4.) The agreement set the purchase price of the vessel at $58,500,000, and required a 10% security deposit, which Prime paid on April 16, 2008.[1] (Woods Decl. Ex. 4.) Albacore signed the MOA in Greece; FR8 signed it in Singapore. (Suanes Decl. ¶ 9.)

The MOA provides that it "shall be governed by and construed in accordance with English law and any dispute arising out of this Agreement shall be referred to arbitration in London . . . ." (Suanes Decl. Ex. B § 16.) Albacore and FR8 are signatories to the MOA; the Prime Defendants are not. (*See* Suanes Decl. Ex. B.)

Under the MOA, the vessel was to be delivered some time between May 1 and June 30, 2009. (Suanes Decl. Ex. B § 5(b).) Accordingly, FR8's English counsel, Mark Bamford ("Bamford"), and the Prime Defendants' Greek counsel, Constantinos Emmanuel ("Emmanuel") and Ekaterini Konidari ("Konidari"), exchanged drafts of the vessel delivery documents in April 2009. (Bamford Decl. ¶¶ 13-20, Exs. 5-9.) On April 30, 2009, Woods sent Topouzoglou a notice that the vessel would be delivered on May 11, 2009. (*Id.* Ex. 11.) The next day, however, Topouzoglou informed FR8 that because of the "global financial meltdown," Albacore's financing arrangements had been "torn apart." (Woods Decl. Ex. 5.) Although Albacore had originally anticipated being able to finance the entire sale price of the vessel with a loan from HSH Nordbank ("HSH"), HSH was now willing to loan no more than $21,600,000, leaving

---

[1] Defendants assert that Albacore paid the 10% deposit (Suanes Decl. ¶ 4), but the receipt from the transaction clearly identifies Prime Marine Corp. as the remitter of the deposit. (Woods Decl. Ex. 4.)

Albacore with a financing deficiency of approximately $39,000,000.  (*Id.*)  Topouzoglou claimed that the financial crisis could serve as a basis for Albacore to invoke the MOA's force majeure clause and terminate the contract; he also offered to finance the difference by giving FR8 a "second mortgage" in the vessel to secure a payment obligation due in five years.  (*Id.*)  FR8, however, rejected Topouzoglou's proposal and insisted that Albacore proceed.  (Bamford Decl. ¶ 29.)  FR8 also asked that Prime guarantee the transaction, but Topouzoglou rejected that request.  (Woods Decl. ¶ 30.)

      FR8 continued to proceed as though the closing for the transaction would occur on May 11, 2009.  On May 6, 2009, Woods sent Topouzoglou a notice that the vessel would be delivered in five days.  (Bamford Decl. Ex. 12.)  The following day, Woods informed Konidari that the closing would be at the Marshall Islands registry in New York.  (*Id.* Ex. 15.)  Konidari then told Bamford and Woods that Emmanuel "will be probably attending the closing meeting on behalf of Buyers."  (*Id.* Ex. 19.)  Between May 8 and May 10, Woods and Bamford both arrived in New York to attend the closing.  (Bamford Decl. ¶ 33; Woods Decl. ¶ 13.)  On May 11, 2009, however, Emmanuel e-mailed Bamford to say that because FR8 "have yet to provide Buyers with a Notice of Readiness for delivery pursuant to line 56 of the MOA," he did not have to attend the closing.  (Bamford Decl. Ex. 20.)  Woods sent a Notice of Readiness that same day, and Bamford asserted that Albacore was contractually obligated to attend the closing, regardless of whether a Notice of Readiness had been provided.  (*Id.* Exs. 21, 22.)  Emmanuel did not come to New York.

      On May 12, 2009, Topouzoglou attempted to invoke the force majeure clause of the MOA to terminate the agreement, citing the global financial crisis.  (Bamford Decl. Ex. 23.)  FR8 in turn accused the defendants of breaching the contract by failing to attend the closing

4

meeting.  (Bamford Decl. ¶ 43.)  On June 25, 2009, FR8 instituted arbitration in London with Albacore only in accordance with the arbitration clause of the MOA.  (Suanes Decl. ¶¶ 7-8.)  This suit followed on March 9, 2010, seeking a judgment that the Prime Defendants are bound to Albacore's arbitration agreement as alter egos of Albacore, and a consequent order compelling the Prime Defendants to join Albacore in defending FR8's claims in the London arbitration.

## DISCUSSION

### I.     Subject Matter Jurisdiction

FR8's complaint asserts two bases for subject matter jurisdiction in this case: diversity jurisdiction under 28 U.S.C. § 1332 and federal question jurisdiction under the Federal Arbitration Act (the "FAA"), 9 U.S.C. §§ 1, *et seq.*, the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention"), and legislation implementing the Convention, 9 U.S.C. §§ 201, *et seq*.  Defendants contend that neither of these grounds provides subject matter jurisdiction.

FR8's first basis, diversity jurisdiction, plainly fails.  The relevant statute confers jurisdiction on district courts in

> civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between—
> **(1)** citizens of different States;
> **(2)** citizens of a State and citizens or subjects of a foreign state;
> **(3)** citizens of different States and in which citizens or subjects of a foreign state are additional parties; and
> **(4)** a foreign state, defined in section 1603(a) of this title, as plaintiff and citizens of a State or of different States.

28 U.S.C. § 1332(a).  Here, there is no diversity because neither FR8 nor any of the defendants were incorporated in the United States, and it is not asserted that any party's principal place of business is in the United States; therefore, diversity jurisdiction fails because foreign corporations occupy both sides of the litigation.  *See Universal Licensing Corp. v. Paola del*

5

*Lungo S.p.A*, 293 F.3d 579, 581 (2d Cir. 2002) ("For purposes of §§ 1332(a)(2) and (3), even if a corporation organized under the laws of a foreign nation maintains its principal place of business in a State, and is considered a citizen of that State, diversity is nonetheless defeated if another alien party is present on the other side of the litigation.") (internal quotation marks and alterations omitted).

As for FR8's second basis, defendants argue that the relevant provisions fail to provide subject matter jurisdiction for this court because FR8 is not a "party aggrieved" under section 4 of the FAA.[2]  That section provides in part:

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under Title 28 . . . , for an order directing that such arbitration proceed in the manner provided for in such agreement.

9 U.S.C. § 4.  "Where there has been no refusal to arbitrate, . . . petitioner is not entitled to compel arbitration under Section 4 . . . ."  *Jacobs v. USA Track & Field*, 374 F.3d 85, 89 (2d Cir. 2004).  On July 7, 2010, during the pendency of this suit, FR8 requested through counsel that the Prime Defendants participate in the London arbitration as if they were signatories and "agree to be joint and severally liable with Albacore."  (Harwood Decl. Ex. 15.)  The Prime Defendants refused on the grounds that they dispute alter ego liability.  (Harwood Decl. Ex. 16.)  Defendants contend that FR8 does not qualify as a party aggrieved because this exchange either failed to meet the MOA's contractual notice requirements or does not comprise a demand and refusal to arbitrate under the MOA.  (Def.'s Reply at 6-7.)

---

[2] The FAA applies to the extent it does not conflict with the Convention.  9 U.S.C. § 208.  In dicta discussing a district court case examining the issue of whether Section 4 conflicts with the Convention, the Second Circuit noted that the district court in that case held that "[b]ecause § 4 imposed no additional limits on a suit brought pursuant to § 206, no conflict existed between the two provisions."  *Phoenix Aktiengesellschaft v. Ecoplas, Inc.*, 391 F.3d 433, 437 (2d Cir. 2004).  The Second Circuit did not hold squarely that Section 4 does not conflict with the Convention, but because the Court concludes that it does have subject matter jurisdiction even if Section 4 applies, it is unnecessary to address this issue.

6

Defendants' first ground for contesting jurisdiction under section 4 fails. The notice requirement of the MOA requires "[a]ll notices required to be given in accordance with this Agreement shall be in writing, by fax or e-mail and shall be addressed" to Prime Management's e-mail address, fax number, or address in Greece. (Suanes Decl. Ex. B § 18.) Defendants cannot defeat subject matter jurisdiction in this case simply because FR8 issued its demand to arbitrate to defendants' counsel rather than to the address specified in the MOA. Moreover, "notices required to be given in accordance with this Agreement" is best construed as referring to those notices dealing with the commercial transaction involved in the MOA, such as those required under MOA § 5, rather than to correspondence in legal proceedings. (*See, e.g.*, Suanes Decl. Ex. B § 5 ("Notices, time and place of delivery"); *id.* § 5(a) ("The Sellers shall keep the Buyers well informed of the Vessel's itinerary and shall provide the Buyers with 10 and 5 days notice of the estimated date for delivery of the Vessel.").)

Defendants' second argument against section 4 jurisdiction has also fails. Generally, a party must make an unequivocal refusal to arbitrate in order to confer jurisdiction on the federal courts under section 4. *See also PaineWebber Inc. v. Faragalli*, 61 F.3d 1063, 1066 (3d Cir. 1995) ("[A]n action to compel arbitration under the FAA accrues only when the respondent unequivocally refuses to arbitrate, either by failing to comply with an arbitration demand or by otherwise unambiguously manifesting an intention not to arbitrate the subject matter of the dispute."). It is unclear to what extent section 4 applies in a case to compel non-signatories to arbitrate, and the parties have cited no case law that illuminates this point.

In a paradigmatic case, "[a] party has refused to arbitrate if it commences litigation or is ordered to arbitrate the dispute by the relevant arbitral authority and fails to do so." *LAIF X SPRL v. Axtel, S.A. de C.V.*, 390 F.3d 194, 198 (2d Cir. 2004) (internal quotation marks and

7

brackets omitted).  FR8 has not asserted that either circumstance exists in this case.  The procedural posture of this case, however, differs from the typical arbitration paradigm.   In the two cases cited by defendants in their motion to dismiss, *Hartford Accident & Indem. Co. v. Equitas Reinsurance Ltd.*, 200 F. Supp. 2d 102 (D. Conn. 2002), and *AES Gener, S.A. v. Compania Carbones del Cesar S.A.*, 08 Civ. 10407 (WHP), 2009 WL 2474192 (S.D.N.Y. Aug. 12, 2009), the parties were signatories to contracts with arbitration clauses.  Here, however, the Prime Defendants are not signatories to the MOA, and their non-signatory status renders some of the inquiries made by the courts in *Hartford Accident* and *AES* inapplicable to the instant case.

For example, *Hartford Accident* focused on whether "the defendants still had an opportunity to accept or reject Hartford's demand to arbitrate before Hartford filed its amended complaint."  *Hartford Accident*, 200 F. Supp. 2d at 109.  There, the plaintiffs had made a demand by letter requesting that the defendants "name their arbitrator within thirty days of the date of this demand."  *Id.* at 106.  Here, a similar demand would be nonsensical.  The MOA's arbitration clause identifies the London Maritime Arbitrators Association ("LMAA") Terms as those which govern arbitration between the parties.  The LMAA Terms, "for the purpose of determining on what date arbitral proceedings are to be regarded as having commenced," refers to section 14 of England's Arbitration Act 1996, which provides in relevant part:

> Where the arbitrator or arbitrators are to be appointed by the parties, arbitral proceedings are commenced in respect of a matter when one party serves on the other party or parties notice in writing requiring him or them to appoint an arbitrator or to agree to the appointment of an arbitrator in respect of that matter.

Arbitration Act, 1996, c. 23, § 14(4) (Eng.).  Because arbitration is already underway between Albacore and FR8, such a notice would be unwarranted in this case, and it seems irrational to require adherence to such formalism to confer subject matter jurisdiction on this Court.

The Court, therefore, finds that the July exchange of letters constitutes an unambiguous demand to arbitrate, if indeed one is necessary for subject matter jurisdiction under the Convention. Although subject matter jurisdiction must ordinarily be present at the commencement of the suit, a dismissal on subject matter jurisdiction grounds would be pointless in this case. FR8 has already commenced a new action against Albacore and the Prime Defendants in this Court with a nearly identical complaint, No. 10 Civ. 08083 (RJH), and the new action post-dates the July exchange of letters.

## II. Failure To State a Claim

### A. Standard of Review

Defendants have also moved to dismiss FR8's claim for failure to state a claim under Fed. R. Civ. P. 12(b)(6). On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) the Court accepts as true all factual allegations in the complaint and draws all reasonable inferences in the plaintiff's favor. *In re DDAVP Direct Purchaser Antitrust Litigation*, 585 F.3d 677, 692 (2d Cir. 2009). The complaint's allegations, however, "must be enough to raise a right of relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Only a "plausible claim for relief survives a motion to dismiss." *LaFaro v. New York Cardiothoracic Group, PLLC*, 570 F.3d 471, 476 (2d Cir. 2009). Thus courts are "not bound to accept as true a legal conclusion couched as a factual allegation," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949-50 (2009) (internal quotation marks omitted).

### B. Choice of Law

Before addressing whether FR8's complaint measures up to the standard articulated by *Twombly* and *Iqbal*, it is necessary to address the parties' contentions about which law applies.

9

In this case, the choice-of-law question affects the elements FR8 must plead in order to maintain a veil-piercing or alter-ego claim. Defendants argue that the law of the Marshall Islands as the place of incorporation governs that inquiry, or, in the alternative, that English law governs because of the MOA's choice-of-law clause. (*See* Def's Mem. at 12-13; Def's Reply at 7 n.2.) The law of the Marshall Islands, in turn, looks to Delaware law, which defendants contend requires proof of fraud to pierce the corporate veil; they argue therefore that "Plaintiff must show that the whole purpose of the corporation was to commit a fraud" to maintain their claim. (Def.'s Mem. at 14.) Under English law, defendants assert that piercing Albacore's veil would be "virtually impossible." (*Id.* at 4.) In contrast, FR8 argues that federal common law governs the question of veil-piercing in the context of an action to compel arbitration under the Convention. (*See* Pl.'s Opp'n 6-8.)[3] Federal common law, according to FR8, "merely requires that the plaintiff allege domination to compel arbitration on the basis of alter ego liability, and not fraud or injustice." (*Id.* at 5-6.) FR8 argues that it need only satisfy the more lenient standard for veil-piercing that federal common law sets forth, but makes no argument that it has adequately pleaded the fraud or injustice that defendants argue is required.

In support of their argument that Marshall Islands law applies, defendants cite *Kalb Voorhis & Co. v. American Financial Corp.*, 8 F.3d 130 (2d Cir. 1993). There, the court applied choice-of-law principles of the forum state, New York, to hold that "[t]he law of the state of incorporation determines when the corporate form will be disregarded and liability will be imposed on shareholders." *Id.* at 132. As noted above, all the companies in Albacore's line of ownership are Marshall Islands corporations. But FR8 correctly points out that in *Kalb*, the court

---

[3] Plaintiff filed two memoranda of law in an apparent attempt to keep each memorandum under the twenty-five page limit required by this Court's Individual Rules. The memorandum referenced here is Plaintiff's "Memorandum of Law in Opposition to Defendants' Motion To Dismiss Complaint Under Fed. R. Civ. P. 12(b)(6) and To Stay Discovery and in Support of Cross-Motion To Compel Limited Discovery Prior to Resolution of Defendants' Motion for Dismissal on Forum Non Conveniens Grounds."

applied New York's choice of law doctrine to a *state law* veil-piercing claim. (*See* Pl.'s Opp'n at 7); *Kalb*, 8 F.3d at 132-33. The Second Circuit disavowed this approach in Convention cases in *Smith/Enron Cogeneration Limited Partnership, Inc. v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88 (2d Cir. 1999). There, although the respondent "suggest[ed] that we must use New York's choice of law to determine the applicable body of contract law," the court found that to do so would "introduce a degree of parochialism and uncertainty into international arbitration that would subvert the goal of simplifying and unifying international arbitration law." *Smith/Enron*, 198 F.3d at 96. The court noted that "as this is a federal question case . . . we see no persuasive reason to apply the [choice-of-law rules] of New York simply because it is the forum of this litigation." *Id.* Therefore, it is inappropriate in this case to apply New York choice-of-law principles to hold that Marshall Islands law governs the question of veil-piercing.

The remaining candidates, then, are English law and federal common law. Where the choice of law in a Convention case is between the law specified by the choice-of-law clause and federal common law, Second Circuit precedent has been less than crystal clear. *See Republic of Ecuador v. ChevronTexaco Corp.*, 376 F. Supp. 2d 334, 354 (S.D.N.Y. 2005) (noting the apparent conflict in Second Circuit law).

Two of the Second Circuit's decisions principally inform the analysis. First, in *Motorola Credit Corp. v. Uzan*, 388 F.3d 39 (2d Cir. 2004), plaintiffs Motorola Credit Corporation ("Motorola") and Nokia Corporation ("Nokia") entered into various financing agreements with non-party companies Telsim and Rumeli Telefon. *Id.* at 43. Each agreement provided that it would be governed by and construed in accordance with Swiss law. *Id.* Both of the non-party companies were controlled by the Uzan family of Turkey, defendants in the action, but the Uzans were not signatories to the agreement. *See id.* at 43, 49. Defendants sought to compel arbitration

under the Convention, asserting that federal common law controls issues of arbitrability while plaintiffs asserted that Swiss law controlled the issue because of the choice-of-law clause. *Id.* at 50. The *Motorola* court held that Swiss law, not federal common law, applied pursuant to the choice-of-law clause. *Id.* at 50-51.

In contrast, *Sarhank Group v. Oracle Corp.*, 404 F.3d 657 (2d Cir. 2005), discounted the choice-of-law clause in the contract and instead applied federal common law to the question of arbitrability. In *Sarhank*, Oracle Systems, Inc. ("Systems") entered into a contract with Sarhank Group ("Sarhank"), an Egyptian corporation. *Id.* at 658. The contract contained an arbitration clause submitting all disputes between Systems and Sarhank for arbitration under Egyptian law. *Id.* Sarhank won an arbitration in which the arbitration panel, purporting to apply Egyptian law, deemed not only Systems but also its parent corporation, Oracle Corporation ("Oracle"), jointly and severally liable for certain damages. *Id.* at 658-59. Sarhank petitioned to confirm and enforce the foreign arbitration award against Oracle, but Oracle contended that because it was never a party to the contract, the arbitrators' award against it was improper. The court concluded that notwithstanding the Egyptian choice-of-law clause in the contract, American federal arbitration law controlled the question of whether Oracle was bound to arbitrate as a non-signatory, and therefore Oracle was not bound by the decision of the arbitrators purporting to apply Egyptian law. *Id.* at 661-62.

Thus, it appears that *Sarhank* counsels against honoring the choice-of-law clause in Convention cases when deciding the question of arbitrability, while *Motorola* counsels for honoring the clause. The Court chooses to follow *Motorola* in this case for two reasons. First, it is unclear that the two cases do, in reality, conflict, as *Sarhank* may be distinguishable from this

case.  Second, to the extent the two cases do conflict, the disharmony should be resolved in a way that allows the application of the choice-of-law clause in this case.

Although *Republic of Ecuador* considered the two cases to be in apparent conflict with each other, a closer examination of *Sarhank*'s reasons for applying American federal arbitration law instead of Egyptian law reveals that *Sarhank* may be distinguishable.  The procedural posture of *Sarhank* was a motion to confirm a foreign arbitral award under the Convention, not one to compel arbitration.  Article V(2) of the Convention "provides that a United States court is not required to enforce an agreement if its subject matter is not capable of arbitration in the United States or if enforcement of the arbitral award would be contrary to American public policy."  *Sarhank*, 404 F.3d at 661 (internal citations omitted).  "Federal arbitration law controls in deciding this issue."  *Id.*  When *Sarhank* applied American law to the question of arbitrability, therefore, it did so in the specific context of addressing Article V defenses to enforcement of awards under the Convention.  *See id.* at 661-62.  That narrow holding, therefore, would not have wider applicability to actions such as this one, in which FR8 seeks to compel arbitration and Article V defenses do not apply.

Furthermore, even if there were a conflict between *Sarhank* and *Motorola*, it is far from clear that it should be resolved in favor of applying American law in this case.  *Republic of Ecuador* held that "[t]he most reasonable way to reconcile *Motorola* and *Sarhank* is to conclude that a choice-of-law clause will govern where a nonsignatory to a particular arbitration agreement seeks to enforce the agreement against a signatory, but not where a signatory seeks to enforce the agreement against a nonsignatory."  *Republic of Ecuador*, 376 F. Supp. 2d at 355.  The court justified this reading by noting:

> In the former case, exemplified by *Motorola*, the party seeking arbitration must implicitly accept that the contract under which arbitration is sought is valid and

13

> binding on it, and the party opposing arbitration has signed the contract, so both parties can reasonably be bound by the choice-of-law clause. In the latter case, exemplified by *Sarhank*, the nonsignatory party opposing arbitration is in essence contending that it is not subject to the contract at all; thus, applying the choice-of-law clause from that contract to determine the issue would beg the question in a manner potentially unfair to the nonsignatory.

*Republic of Ecuador*, 376 F. Supp. 2d at 355. The court noted that "[o]ne might argue that the holding of *Sarhank* is inapplicable to this case because that holding dealt with the circumstances under which 'an American nonsignatory could be bound to arbitrate,' and this case deals with whether a *foreign* nonsignatory can be bound to arbitrate." *Id.* (quoting *Sarhank*, 404 F.2d at 662) (emphasis in original). Nevertheless, because the signatory/nonsignatory distinction was "more significant" than the American/foreign distinction and because its proposed reconciliation was more "consistent with the *Smith/Enron* principle that 'parochialism' in international arbitration should be avoided," the court concluded that its reconciliation of *Sarhank* and *Motorola* was proper. *Id.* at 355-56.

    *Republic of Ecuador*'s conclusion, however, appears to be unwarranted. First, the "anti-parochialism" principle of *Smith/Enron* is one that refers to the application of state choice-of-law rules in Convention contexts, not one that counsels against the recognition of contractual choice-of-law clauses. *See Smith/Enron*, 198 F.3d at 96. Second, although the signatory/nonsignatory distinction is certainly "significant," that does not end the inquiry—it must be significant in a way that is relevant to whether a choice-of-law clause should govern the question of arbitrability. Although *Republic of Ecuador* argues that where a signatory seeks to compel a non-signatory to arbitrate, application of the choice-of-law clause could be "unfair to the nonsignatory," *Republic of Ecuador*, 376 F. Supp. 2d at 355, this is only true when federal common law is more protective of the non-signatory than the law specified by the choice-of-law clause. In this case, however, it is the non-signatory being compelled to arbitrate who seeks the protection of the

14

choice-of-law clause, while the signatory, FR8, seeks to avoid the choice-of-law clause in the very agreement it seeks to enforce. *Motorola*'s rationale that if parties "wish to invoke the arbitration clauses in the agreements at issue, they must also accept the . . . choice-of-law clauses that govern those agreements" seems more applicable to FR8 in this situation than does a blanket rule dividing signatories and non-signatories. *See Motorola*, 388 F.3d at 51. Indeed, the signatory/nonsignatory distinction appears nowhere in *Motorola*'s reasoning. Instead, *Motorola* reasoned that:

> Defendants also argue that applying federal law to the interpretation of arbitration agreements is required to further the purposes of the FAA and to create a uniform body of federal law on arbitrability. Their uniformity argument has some force where the parties have not selected the governing law. But where the parties have chosen the governing body of law, honoring their choice is necessary to ensure uniform interpretation and enforcement of that agreement and to avoid forum shopping. This is especially true of contracts between transnational parties, where applying the parties' choice of law is the only way to ensure uniform application of arbitration clauses within the numerous countries that have signed the New York Convention.

*Motorola*, 388 F.3d at 51. If the Court were to adhere to *Republic of Ecuador*'s proposed reconciliation, it would give the plaintiff the opportunity to forum-shop. Plaintiffs who seek to compel a non-signatory to arbitrate but whose choice-of-law clauses specify a law more restrictive than the United States' with respect to such actions could simply elect to come to the United States whenever a basis for jurisdiction over the non-signatory defendant exists and thereby avail themselves of favorable American law.

In either case, then, *Motorola* is the controlling law in this case, and English law applies.[4]

---

[4] FR8 also argues that *Smith/Enron* and *Compagnie Noga D'Importation et D'Exportation S.A. v. Russian Federation*, 361 F.3d 676 (2d Cir. 2004) stand for the proposition that federal common law is to be applied in Convention cases deciding arbitrability. (*See* Pl.'s Opp'n at 6.) But *Smith/Enron* does "not hold that a court must set aside a choice-of-law clause in determining arbitrability; instead, [it] appear[s] to be [a] case[] where neither party raised the choice-of-law issue." *Motorola*, 388 F.3d at 51. FR8's citation to *Compagnie Noga*, furthermore, is only to Judge Jacobs's concurring opinion; the controlling majority opinion declined to decide the choice-of-law question. *See Compagnie Noga*, 361 F.3d at 685 ("In any event, because we conclude that the answer to this

**C. Applying the English Law of Lifting the Corporate Veil**

The parties did not brief the issue of piercing the corporate veil under English law other than to raise the possibility in their briefs that English law might govern this question. Although under Fed. R. Civ. P. 44.1, "[i]n determining foreign law, the court may consider any relevant material or source . . . whether or not submitted by a party or admissible under the Federal Rules of Evidence," and could therefore conduct its own foreign-law inquiry in this case, it seems more prudent to allow the parties to brief the issue of whether FR8 has adequately pleaded its veil-piercing claim under English law.[5] Accordingly, the Court denies defendants' motion to dismiss under Rule 12(b)(6) at this time without prejudice to renewing the motion and briefing the issue of English law.

Because the question of whether FR8 has adequately pleaded its claim under English law may be dispositive, the Court declines at this time to consider defendants' motion to dismiss for *forum non conveniens*.

**III. Cross-Motion To Compel Discovery**

FR8 also cross-moves to compel discovery to allow it "establish the merits of its right to compel Prime to arbitrate and oppose Defendants' *forum non conveniens* motion." (Pl.'s Opp'n at 15.) As for discovery on the *forum non conveniens* motion, "it is the well established practice in the Southern District of New York to decide such motions on affidavits." *Alcoa Steamship Co. v. M/V Nordic Regent*, 654 F.2d 147, 158 (2d Cir. 1980); *see also Transunion Corp. v. PepsiCo, Inc.*, 811 F.2d 127, 130 (2d Cir. 1987) ("Motions to dismiss for forum non conveniens may be decided on the basis of affidavits. Indeed, as the Court noted in *Piper Aircraft* [*Co. v.*

---

question is the same regardless which of the bodies of law advocated by the parties is applied here, we need not cut the Gordian choice-of-law knot presented to us by the parties.").

[5] The Court notes that from a cursory review of Judge Cote's recent opinion in *In re Tyson*, 433 B.R. 68 (S.D.N.Y. 2010), which conducted a thorough and detailed survey of the English law of veil-piercing, it appears that FR8 faces an uphill battle in opposing a motion to dismiss based on this law.

*Reyno,* 454 U.S. 235, 258 (1981)], '[r]equiring extensive investigation would defeat the purpose of [the] motion.'"). Although in some cases, courts have allowed a party to depose its adversary's foreign law expert, *see, e.g.*, *Base Metal Trading S.A. v. Russian Aluminum*, No. 00 Civ. 9627 (JGK) (FM), 2002 WL 987257, at *4 (S.D.N.Y. May 14, 2002), the Court in this case chooses to stick to the well-worn path of the established practice in this District. Unlike in the cases FR8 cites, there seems to be little utility in allowing discovery on the *forum non conveniens* issue at this point. In *Base Metal Trading*, for example, the foreign-law experts had "sharply differing views of the fundamental fairness of the Russian courts." *Id.* Here, no such "sharply differing views" are presented to the Court. Indeed, it appears that plaintiff's foreign-law expert agrees at least with the basic principles set forth by defendants' expert. (*See* Supplemental Declaration of Grigorios Timagenis ¶ 12.) Plaintiff's expert, unsurprisingly, appears to believe that Greek law is nevertheless inadequate, but this is not an issue that requires the Court to deviate from the established practice of this District.

FR8 also contends that the Court should compel discovery in order to allow it to establish the merits of its right to compel Prime to arbitrate. But FR8 identifies no issues of fact that would benefit currently from compelling discovery in this case. In *Dun Shipping Ltd. v. Amerada Hess Shipping Corp.*, 234 F. Supp. 2d 291 (S.D.N.Y. 2002), a case FR8 cites, limited discovery on arbitrability was useful because there was "strong disagreement among the parties as to whether Dun Shipping and/or Knock Tankers reasonably indicated to Hess Shipping that Dun Shipping was a principal." *Id.* at 294-95. In this case, however, no such strong factual disagreement exists. Instead, the parties seem to agree that Albacore is a corporation organized solely for the purpose of owning a single ship; the relevant question is whether that structure is

17

susceptible to veil-piercing under the applicable law. Discovery at this point is unhelpful to that inquiry. Accordingly, the cross-motion to compel discovery is denied.

## CONCLUSION

For the foregoing reasons, the Court DENIES defendant's motion to dismiss [11] this action under Fed. R. Civ. P. 12(b)(6) without prejudice to renewing the motion within thirty days with appropriate proof of English law. The Court DENIES plaintiff's cross-motion to compel discovery [15].

SO ORDERED.

Dated: New York, New York
December 13, 2010

Richard J. Holwell
United States District Judge

18