UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| FR 8 SINGAPORE PTE. LTD., | | |
| Plaintiff, | | |
| -against- | | 10 Civ. 1862 (RJH) |
| | | **MEMORANDUM OPINION AND ORDER** |
| ALBACORE MARITIME INC., PRIME MARINE CORP., PRIME MARINE MANAGEMENT INC., and PMC HOLDING INC. d/b/a PRIME MARINE HOLDINGS INC., | | |
| Defendants. | | |

| | | |
|---|---|---|
| FR 8 SINGAPORE PTE. LTD., | | |
| Plaintiff, | | |
| -against- | | 10 Civ. 8083 (RJH) |
| ALBACORE MARITIME INC., PRIME MARINE CORP., PRIME MARINE MANAGEMENT INC., and PMC HOLDING INC. d/b/a PRIME MARINE HOLDINGS INC., | | |
| Defendants. | | |

Richard J. Holwell, District Judge:

Plaintiff FR 8 Singapore Pte. Ltd. ("FR8") commenced the above-captioned actions on

March 9, 2010, and October 25, 2010, against defendants Albacore Maritime ("Albacore"),

Prime Marine Corp., Prime Marine Management Inc., and PMC Holding Inc. (collectively, the

1

"Prime Defendants") to compel the Prime Defendants to arbitrate FR8's claims in London as alter egos of Albacore. The two actions are based essentially on the same set of facts and assert the same claims; the latter action was commenced primarily to avoid a possible dismissal for lack of subject matter jurisdiction. When defendants previously moved to dismiss, the Court decided that English law applied to the question of whether the Prime Defendants were alter egos of Albacore, but denied the motion with leave to renew because the parties had not briefed the issue of the English law of corporate veil-piercing. Now before the Court are FR8's motions for reconsideration and for a certificate of appealability and defendants' renewed motion to dismiss. For the reasons that follow, FR8's motions are DENIED, and defendants' motion is GRANTED.

## BACKGROUND

The Court assumes familiarity with the facts recited in its earlier opinion (the "Opinion") and does not recount them here. *See FR 8 Singapore Pte. Ltd. v. Albacore Maritime Inc.*, --- F. Supp. 2d ----, 2010 WL 5076594 (S.D.N.Y. Dec. 13, 2010).

Previously, the Court, relying on the Second Circuit's decision in *Motorola Credit Corp. v. Uzan*, 388 F.3d 39 (2d Cir. 2004), found that the English choice-of-law clause in the Memorandum of Agreement ("MOA") governed the inquiry of whether the Prime Defendants were alter egos, but denied the motion to dismiss with leave to renew. Defendants timely renewed their motion to dismiss. Before they did so, FR8 brought a motion for reconsideration, contending that the Opinion ignored a line of precedent compelling a conclusion that federal common law, not English law, governs the alter-ego inquiry. In the alternative, FR8 requested certification for immediate appeal. This opinion first addresses FR8's motion for reconsideration and then defendants' renewed motion to dismiss.

**DISCUSSION**

**I.   Standard of Review for a Motion for Reconsideration**

"A request for reconsideration under Rule 6.3 . . . must demonstrate controlling law or factual matters put before the court in its decision on the underlying matter that the movant believes the court overlooked and that might reasonably be expected to alter the conclusion reached by the court."  *Hinds County, Miss. v. Wachovia Bank N.A.*, 708 F. Supp. 2d 348, 369 (S.D.N.Y. 2010).  "The standard for granting such a motion is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court."  *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995); *see also Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir.1992) ("The major grounds justifying reconsideration are an intervening change in controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." (internal quotation marks omitted)).

**II.   FR8's Arguments for Reconsideration**

In its motion for reconsideration, FR8 argues that the Court overlooked two lines of precedent that counsel in favor of a finding that federal common law applies: (1) a line indicating that federal common law may only be disregarded in favor of another body of law when the agreement explicitly so provides; and (2) a line indicating that the "federal substantive law of arbitrability" applies to the inquiry of whether the Prime Defendants are alter egos.  FR8 also argues that *Motorola* was wrongly decided.  The Court addresses these arguments in turn.

**A.  Choice-of-law Clauses and Federal Common Law**

FR8 argues that federal common law may only be disregarded in favor of another body of law when the agreement explicitly so provides, relying primarily on *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52 (1995).  There, the parties' agreement contained a choice-of-law clause providing that the agreement "shall be governed by the laws of the State of New York" and an arbitration clause providing that "'any controversy' arising out of the transactions between the parties 'shall be settled by arbitration in accordance with the rules of the National Association of Securities Dealers (NASD), or the Boards of Directors of the New York Stock Exchange and/or the American Stock Exchange.'"  *Mastrobuono*, 514 U.S. at 58-59.  The parties submitted their dispute to arbitration where the arbitral panel awarded punitive damages, but under New York law, the power to award punitive damages "is limited to judicial tribunals and may not be exercised by arbitrators."  *Id.* at 54-55 (citing *Garrity v. Lyle Stuart, Inc.*, 353 N.E.2d 793 (N.Y. 1976)).  The Supreme Court granted certiorari "because the Courts of Appeals ha[d] expressed differing views on whether a contractual choice-of-law provision may preclude an arbitral award of punitive damages that otherwise would be proper."  *Id.* at 55.

The Court first analyzed the choice-of-law provision in isolation.  When viewed as "merely a substitute for the conflict-of-laws analysis," the choice-of-law clause could be analogized to the parties having signed the contract in New York, and nothing about such an act could be viewed as an express intent to exclude punitive damages claims.  Accordingly, "in the absence of contractual intent to the contrary, the [Federal Arbitration Act ("FAA")] would pre-empt the *Garrity* rule."  *Id.* at 59.  Even if viewed as more than a mere substitute for the conflict-of-laws analysis, however, the Court found that the choice-of-law provision "might include only New York's substantive rights and obligations, and not the State's allocation of power between

4

alternative tribunals." *Id.* at 59-60.  Because New York allows its courts (though not its arbitrators) to award punitive damages, under that interpretation the choice-of-law clause would not exclude the punitive damages award.  *See id.*

Turning to the arbitration provision, the Court found that it "strongly implie[d] that an arbitral award of punitive damages is appropriate."  *Id.* at 60.  This was because the NASD rules under which arbitration was authorized indicated that arbitrators could consider punitive damages as a remedy.  *Id.* at 60-61.

Reading the two clauses together, then, the Court found that "[a]t most, the choice-of-law clause introduces an ambiguity into an arbitration agreement that would otherwise allow punitive damages awards."  *Id.* at 62.  The Court therefore found that "the best way to harmonize the choice-of-law provision with the arbitration provision is to read 'the laws of the State of New York' to encompass substantive principles that New York courts would apply, but not to include special rules limiting the authority of arbitrators."  *Id.* at 63-64.

The Second Circuit decided two cases in the wake of *Mastrobuono* that used that decision's reasoning.  First, in *Nat'l Union Fire Insurance Co. v. Belco Petroleum Corp.*, 88 F.3d 129 (2d Cir. 1996), the appellants argued that New York law should apply to the question of who should decide the preclusive effect of a prior arbitration based on the choice-of-law clause in the arbitration agreement.  Applying *Mastrobuono*, the court found that it was "not persuaded that the parties here agreed to incorporate into their agreement to arbitrate New York law on which forum decides the preclusive effect of a prior arbitration."  88 F.3d at 134.  The court noted that "[a]s in *Mastrobuono*, we decline to read the choice-of-law clause . . . as referring to 'New York decisional law, including that State's allocation of power between courts and arbitrators, notwithstanding otherwise-applicable federal law.'"  *Id.* at 135 (quoting *Mastrobuono*, 514 U.S.

5

at 60).  The court concluded, "harmoniz[ing] the arbitration and choice-of-law clauses precisely as the Court did in *Mastrobuono*," that "the choice-of-law clause is not an unequivocal inclusion of a New York rule that requires the preclusive effect of a prior arbitration to be decided by the court because there is another—and we think more persuasive—way to read the clause that adheres closer to the federal policy in favor of arbitration."  *Id.*

Second, in *Doctor's Associates, Inc. v. Distajo*, 107 F.3d 126 (2d Cir. 1997), certain franchisees argued that either Illinois or Connecticut law should apply to the issue of whether the franchisor waived its right to compel arbitration of their state-court claims based on its conduct in connection with prior litigation proceedings.  107 F.3d at 130.  As in *Belco*, however, the court found that "even the inclusion in the contract of a general choice-of-law clause does not require application of state law to arbitrability issues, unless it is clear that the parties intended state arbitration law to apply on a particular issue."  *Id.* at 131.  Applying federal law, including "the strong federal policy of enforcing agreements to resolve disputes through arbitration," the court then found that the franchisor did not waive its right to compel arbitration.  *Id.* at 131-34.

FR8 contends that these cases, particularly *Mastrobuono*, established a presumption that "federal law applies to the enforceability of an arbitration agreement, including enforcement against non-signatories, unless a choice-of-law provision unambiguously reverses that presumption."  (Pl.'s Reconsideration Mem. at 11-12.)  But the broad reading of *Mastrobuono*, *Belco*, and *Distajo*, extending the application of federal law to the question of corporate veil-piercing, is not necessarily warranted.  Each one of those cases dealt with a conflict between state law constricting the ability of arbitrators to decide certain issues and the federal policy embodied in the FAA favoring dispute resolution in arbitration.  Here, the substantive dispute—whether Albacore breached the MOA—is already being resolved in arbitration.  Thus, the

"conflict," to the extent one exists, between English and federal law is not over law relating to the arbitral panel's authority, such as the scope of issues to be decided in the arbitration or "allocation of power between courts and arbitrators," *Mastrobuono*, 514 U.S. at 60, but on the more general, substantive contract issue of who is party to the arbitration agreement, a distinction the Supreme Court has found significant. *See Arthur Andersen LLP v. Carlisle*, 129 S. Ct. 1896, 1902-03 (2009) ("Respondents' final fallback consists of reliance upon dicta in our opinions, such as the statement that 'arbitration . . . is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration,' and the statement that 'it goes without saying that a contract can bind a nonparty.' The former statement pertained to *issues* parties agreed to arbitrate, and the latter referred to an entity . . . which obviously had no third-party obligations under the contract in question. Neither these nor any of our other cases have presented for decision the question whether arbitration agreements that are otherwise enforceable by (or against) third parties trigger protection under the FAA." (internal citations omitted) (emphasis in original)); *see also Perry v. Thomas*, 482 U.S. 483, 492 n.9 (1987) ("An agreement to arbitrate is valid, irrevocable, and enforceable, *as a matter of federal law,* 'save upon such grounds as exist at law or in equity for the revocation of *any* contract.' Thus state law, whether of legislative or judicial origin, is applicable *if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally." (quoting 9 U.S.C. § 2) (internal citation omitted) (emphasis in original)).

FR8's argument therefore is based on the flawed premise that because one can label the issue of alter-ego liability with respect to an arbitration clause as an "arbitrability" issue, that this case comes under the umbrella of *Mastrobuono*, *Belco*, and *Distajo*. But those were all cases in which the issue to be decided in this case—whether a third party can be bound by the

agreement—was not at issue.  Moreover, those cases dealt with a conflict between state law specifically directed at arbitration proceedings and the federal policy favoring the resolution of disputes in arbitration.  In contrast, the law here is one of general applicability to contracts regarding whether a third party is bound by a contract.  *Motorola* speaks more directly to that issue and elected to honor the choice-of-law clause in that context.

Because these cases can be distinguished, and because *Motorola* constitutes more specific, binding precedent on this Court on the point of law at issue in this case, the Court is not persuaded by these cases to reconsider its earlier decision.

**B.  The Federal Common Law of Arbitrability**

FR8 also argues that the "'federal substantive law of arbitrability' applies not only to the scope of arbitral *issues*, but also to the enforceability of the arbitration agreements against non-signatories."  (Pl.'s Reconsideration Mem. at 5.)

The most recent Supreme Court case that FR8 cites, however, does not support its point.  In *Arthur Andersen*, certain non-signatories to an arbitration agreement moved to stay litigation filed against them pursuant to section 3 of the FAA, 9 U.S.C. § 3.  129 S. Ct. at 1899-1900.  The District Court denied the motions, and the Sixth Circuit dismissed an appeal from that denial for want of jurisdiction based on a "determination that those who are not parties to a written arbitration agreement are categorically ineligible for relief."  *Id.* at 1901.

The Supreme Court reversed, finding first that the Sixth Circuit did have appellate jurisdiction.  *Id.* at 1900-01.  The Court continued its analysis to find that "[e]ven if the Court of Appeals were correct that it had no jurisdiction over meritless appeals, its ground for finding this appeal meritless was in error."  *Id.* at 1901.  The Court began by analyzing the statutory provisions at issue in the case:

> Section 2—the FAA's substantive mandate—makes written arbitration agreements valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of a contract.  That provision creates substantive federal law regarding the enforceability of arbitration agreements, requiring courts to place such agreements upon the same footing as other contracts.  Section 3, in turn, allows litigants already in federal court to invoke agreements made enforceable by § 2.  That provision requires the court, on application of one of the parties, to stay the action if it involves an issue referable to arbitration under an agreement in writing.

*Id.* at 1901-02 (internal quotation marks and citations omitted).  Neither section 2 nor section 3 of the FAA, however, "purports to alter background principles of state contract law regarding the scope of agreements (including the question of who is bound by them)."  *Id.* at 1902.  The Court therefore found that "[s]tate law . . . is applicable to determine which contracts are binding under § 2 and enforceable under § 3 '*if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally.'"  *Id.* (quoting *Perry*, 482 U.S. at 493 n.9) (emphasis in original).  Accordingly, the Court held "that a litigant who was not party to the relevant arbitration agreement may invoke § 3 if the relevant state contract law allows him to enforce the agreement."  *Id.* at 1903.  In that case, then, notwithstanding the "substantive federal law" about the enforceability of arbitration agreements, the question of who was bound by such agreements was treated as a question of state law.

Nor do the other cases FR8 cites speak to the particular question posed by this case, *i.e.*, whether the ability to compel a non-signatory to arbitrate is covered by a choice-of-law clause. In *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614 (1985), the Court considered the question of "the arbitrability, pursuant to the [FAA] and the [Convention] of claims arising under the Sherman Act, 15 U.S.C. § 1 *et seq.*, and encompassed within a valid arbitration clause in an agreement embodying an international commercial transaction."  473 U.S. at 616.  The parties in that case had entered into an agreement containing a clause providing

for arbitration of all disputes arising out of the agreement in Japan in accordance with the rules of the Japan Commercial Arbitration Association.  *Id.* at 617.  The Court noted that the "first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute," and that that determination was to be made "by applying the federal substantive law of arbitrability."  *Id.* at 626 (internal quotation mark omitted).  As with *Mastrobuono*, *Belco*, and *Distajo*, the "federal substantive law of arbitrability" applied in *Mitsubishi* was applied to the issues covered by the arbitration clause, not to the question of whom the clause could bind.  *See id.* at 628 ("[T]he Court of Appeals correctly conducted a two-step inquiry, first determining whether the parties' agreement to arbitrate reached the statutory issues, and then, upon finding it did, considering whether legal constraints external to the parties' agreement foreclosed the arbitration of those claims.  We endorse its rejection of [respondent's] proposed rule of arbitration-clause construction.").

       In *David L. Threlkeld & Co. v. Metallgesellschaft Ltd.*, 923 F.2d 245 (2d Cir. 1991), the plaintiff, a signatory to the agreement, asserted that a Vermont law voided any arbitration agreement between the parties.  The court held that the FAA and the Convention preempted the Vermont statute, which "effectively reincarnate[d] the former judicial hostility towards arbitration" in contravention to the FAA's policy liberally favoring arbitration.  923 F.2d at 250.  In *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*, 241 F.3d 135 (2d Cir. 2001), the respondent argued that an ad hoc arbitration agreement existed to arbitrate the issue of whether a binding "charter party," a contract by which an entire ship or some principal part thereof is let to a merchant, had been formed.  The court rejected that argument, found that a binding charter party including an arbitration clause had been formed, and granted the petitioner's motion to compel arbitration based on that charter party.  241 F.3d at 146-50.  In *Genesco, Inc. v. T.*

*Kakiuchi & Co.*, 815 F.2d 840, 845 (2d Cir. 1987), the issue to which "national substantive law governing questions of the validity and the enforceability of arbitration agreements under its coverage" applied was whether exchanges of purchase order forms evinced an agreement to arbitrate. In all three of these cases, the existence of a valid agreement to arbitrate was at issue, and the court applied federal law to answer that question. The existence of a valid agreement is not at issue here; no party contests whether the agreement to arbitrate between Albacore and FR8 is a valid agreement to arbitrate. None of these cases, however, speak to the more specific question covered by *Motorola*, namely the question of whether an arbitration agreement between two parties binds non-signatory third parties. Furthermore, *Motorola* specifically considered decisions "that apply federal law to the question of arbitrability despite the presence of a choice-of-law clause designating another forum's laws" and nevertheless held that "if defendants wish to invoke the arbitration clauses in the agreements at issue, they must also accept the Swiss choice-of-law clauses that govern those agreements." 388 F.3d at 51.

FR8 includes several other Second Circuit cases in a string cite intended to support its argument about the "federal law of arbitrability." *Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 96 (2d Cir. 1999); *Thomson-CSF, S.A. v. Am. Arb. Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995) (applying "ordinary principles of contract and agency" to the question of whether a nonsignatory could be bound by an arbitration agreement, but no choice-of-law clause was considered in that case); *Coenen v. R.W. Pressprich & Co.*, 453 F.2d 1209, 1211 (2d Cir. 1972) ("Once a dispute is covered by the Act, federal law applies to all questions of interpretation, construction, validity, revocability, and enforceability."). But "these authorities do not hold that a court must set aside a choice-of-law clause in determining arbitrability; instead, they appear to be cases where neither party raised the choice-of-law issue."

*Motorola*, 388 F.3d at 51.  *Thomson-CSF*, for example, contains no discussion of the choice-of-law issue.  *Smith/Enron* specifically declined to consider the question.  198 F.3d at 96 ("In this case, the 1994 Agreement's dispute resolution provision provided that arbitration 'shall for all purposes be governed by, and construed and enforced in accordance with, the [FAA], and matters of interpretation of the provisions of this Agreement shall be governed by Texas law in any such arbitration.' . . .  While the language quoted immediately above might justify looking to Texas law on assignments, neither party argued that it applied.").  And *Coenen* did not deal with the issue of whether a nonsignatory was bound by an arbitration clause, but instead dealt with "whether a particular dispute is covered by an arbitration clause."  453 F.2d at 1212.

FR8's general argument about the "federal law of arbitrability," then, falls short of carrying its burden on a motion for reconsideration.[1]

## C.  Whether *Motorola* Was Wrongly Decided

Ultimately, FR8's argument proves too much.  Because FR8 contends that federal common law must apply to every issue of "arbitrability" under the Convention and the FAA, including whether an agreement to arbitrate binds third parties, notwithstanding a choice-of-law clause specifying a different forum's law, its argument runs up against the Second Circuit's decision in *Motorola*, which applied Swiss law to that question.  FR8 therefore contends, as it must, that *Motorola* ignored the lines of precedent it has adduced in this motion and was therefore wrongly decided.

Of course, "[t]his Court is bound to follow controlling Second Circuit precedent unless that precedent is overruled or reversed."  *Unicorn Bulk Traders Ltd. v. Fortune Maritime Enters., Inc.*, No. 08 Civ. 9710 (PGG), 2009 WL 125751, at *2 (S.D.N.Y. Jan. 20, 2009).  Accordingly,

---

[1] FR8 also cites a number of cases from other Circuits and from within this district that purport to support its argument, but none of those cases are the sort of "controlling law" that would support a motion for reconsideration.

even if FR8's argument is correct on this point, it is not this Court's station to evaluate that argument.

But even if the Court could consider the question of whether *Motorola* was wrongly decided, certain policy considerations weigh in favor of its reasoning.  In *Motorola*, the defendants argued that "applying federal law to the interpretation of arbitration agreements is required to further the purposes of the FAA and to create a uniform body of federal law on arbitrability."  388 F.3d at 51.  The court rejected that argument, finding:

> Their uniformity argument has some force where the parties have not selected the governing law. But where the parties have chosen the governing body of law, honoring their choice is necessary to ensure uniform interpretation and enforcement of that agreement and to avoid forum shopping. This is especially true of contracts between transnational parties, where applying the parties' choice of law is the only way to ensure uniform application of arbitration clauses within the numerous countries that have signed the New York Convention.

*Id.*

The Supreme Court exhibited similar policy concerns about honoring the choice of commercial actors in international transactions when discussing "the utility of forum-selection clauses in international transactions."  *Mitsubishi*, 473 U.S. at 629.  There, the Court discussed *The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972), a case in which "an American oil company, seeking to evade a contractual choice of an English forum and, by implication, English law, filed a suit in admiralty in a United States District Court against the German corporation which had contracted to tow its rig to a location in the Adriatic Sea."  *Mitsubishi*, 473 U.S. at 629.  The Court noted that in that case, "[n]otwithstanding the possibility that the English court would enforce provisions in the towage contract exculpating the German party which an American court would refuse to enforce, this Court gave effect to the choice-of-forum clause."  *Id.*  Quoting *The Bremen*, the Court observed:

> The expansion of American business and industry will hardly be encouraged if, notwithstanding solemn contracts, we insist on a parochial concept that all disputes must be resolved under our laws and in our courts. . . .  We cannot have trade and commerce in world markets and international waters exclusively on our terms, governed by our laws, and resolved in our courts.

*Mitsubishi*, 473 U.S. at 629 (quoting *The Bremen*, 407 U.S. at 9).  The Court found that *The Bremen* and a later decision, *Scherk v. Alberto-Culver Co.*, 417 U.S. 506 (1974), "establish a strong presumption in favor of enforcement of freely negotiated contractual choice-of-forum provisions."  *Mitsubishi*, 473 U.S. at 631.  After the implementation of the Convention, "that federal policy applies with special force in the field of international commerce."  *Id.*

Although that discussion occurred in the context of choice-of-forum clauses, its policy concerns are also applicable to this case.  Here, the parties are all foreign corporations.  The contract at issue was negotiated by English and Greek lawyers, and the only factual connections to the United States are that the closing was supposed to have taken place (but did not) at the Marshall Islands registry in New York, and that the defendants had registered to do business in New York in an apparent attempt to avoid maritime attachment prior to the Second Circuit's decision in *Shipping Corp. of India v. Jaldhi Overseas Pte Ltd.*, 585 F.3d 58 (2d Cir. 2009).  (*See* Def.'s Mem. in Support of First Motion to Dismiss at 8-9 ("The only reason this action was brought in the United States is that the Prime Companies registered to do business in New York to attempt to avoid the highly disruptive practice of maritime attachment of dollar denominated wire transfers passing through New York.").)  The tenuous connections to the United States in this case make it unlikely that the MOA signatories viewed the federal common law of this country as the background principle that would govern their corporate separateness; it seems much more likely that the English choice-of-law clause evinces an understanding that the English idea of corporate separateness would serve as the relevant background principle.

14

Indeed, to the extent that the federal common law of piercing the corporate veil is more favorable than the chosen law in a breach of contract case, mandating the application of our law in spite of the choice-of-law clause invites international plaintiffs who seek to force deep-pocketed corporate parents to be liable for their subsidiary's breaches of contract and are disgruntled with the choice of law in the contract to use the courts of the United States as a way to get around their bargain.  As the Opinion noted, this invites forum-shopping, effectively allowing the United States to become a veil-piercing clearinghouse and giving plaintiffs a second opportunity at negotiating the choice of law in the contract so long as they are able to cloak the issue in the garb of "arbitrability."  This second bite at the apple hardly achieves "the orderliness and predictability essential to any international business transaction."  *Mitsubishi*, 473 U.S. at 631.  Thus *Motorola*'s policy rationale invoking the uniformity of international commercial transactions seems sound.

Nor is this policy rationale inconsistent with decisions such as *Mastrobuono*, *Belco*, and *Distajo*, which deal with the conflict between the federal policy favoring arbitration and state arbitration law.  *Mastrobuono* itself rationalized its reading of the choice-of-law clause in that case on the grounds that the parties likely did not intend to import New York law specifically applying the allocation of power between courts and arbitrators.  *Mastrobuono*, 514 U.S. at 59-60.  Applying federal law to such cases through the arbitration clause upsets no party's expectations and does not threaten the predictability of international business transactions.  The doctrine of corporate separateness, however, is one on which parties might be much more likely to rely in their selection of a certain forum's laws.

The Court therefore declines the invitation to find that *Motorola* was wrongly decided, and declines also to reconsider its prior decision.  English law therefore applies to the question of whether to pierce Albacore's corporate veil on defendants' renewed motion to dismiss.

## III. Renewed Motion To Dismiss

### A.  Standard of Review

Defendants have renewed their motion to dismiss FR8's claim under Fed. R. Civ. P. 12(b)(6).  On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) the Court accepts as true all factual allegations in the complaint and draws all reasonable inferences in the plaintiff's favor.  *Chase Group Alliance LLC v. City of New York Dep't of Fin.*, 620 F.3d 146, 150 (2d Cir. 2010).  The complaint's allegations, however, "must be enough to raise a right of relief above the speculative level."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Only a "plausible claim for relief survives a motion to dismiss."  *LaFaro v. New York Cardiothoracic Group, PLLC*, 570 F.3d 471, 476 (2d Cir. 2009).  Thus courts are "not bound to accept as true a legal conclusion couched as a factual allegation," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009) (internal quotation marks omitted).

### B.  English Law of Corporate Veil-Piercing

Defendants have submitted the declaration of Graham Charkham, an English barrister, to show English law on the law of piercing the corporate veil.  Plaintiff has submitted the declaration of Peter Robert de Verneuil Smith, also an English barrister, on the same topic.

Charkham and Smith agree on the general principles of the English law of veil-piercing, and agree that the law is summarized accurately in Judge Cote's opinion in *In re Tyson*, 433 B.R. 68 (S.D.N.Y. 2010), in an English court decision, *Faiza Ben Hashem v. Abdulhadi Ali Shayif*,

[2008] EWHC (Fam) 2380, [150]-[184], and in a treatise, 14 Halsbury's Laws of England ¶ 121

(5th ed. 2009).  (*See* Smith Decl. ¶ 7 ("I agree with Mr. Charkham that the authorities he refers to

accurately set out the general approach of the English Courts to piercing the corporate veil.").)

The general rule in under English law has its origin in *Salomon v. A. Salomon & Co. Ltd*,

[1897] A.C. 22 (H.L.), which established that a corporation is a legal entity separate from, and

distinct from, the shareholders and officers of the company.  Thus, "ownership and control of a

company are not of themselves sufficient to justify piercing the veil."  *Ben Hashem*, [2008]

EWHC (Fam) 2380, [159].  Nevertheless, English courts will pierce the corporate veil in limited

circumstances.  Judge Cote's survey of the English law of veil-piercing distilled that doctrine

into a few principles.

"First, . . . the fact that a person engages in the carrying on of a business using a duly

incorporated, yet seemingly artificial, entity is not sufficient to justify piercing that entity's veil."

433 B.R. at 86 (internal quotation marks omitted).  Instead, "[l]egal formalisms must be

respected even at the risk of abiding a seeming injustice . . . .  Accordingly, veil piercing is quite

rare under English law."  *Id.*; *accord Ben Hashem*, [2008] EWHC (Fam) 2380, [160] ("[T]he

court cannot pierce the corporate veil, even where there is no unconnected third party involved,

merely because it is thought to be necessary in the interests of justice."); 14 Halsbury's Laws of

England ¶ 121 (5th ed. 2009) ("There may, however, be cases where the wording of a particular

statute or contract justifies the treatment of parent and subsidiary as one company, at least for

some purposes; or where the court will 'pierce (or lift) the corporate veil', not because it

considers it just to do so but because special circumstances exist indicating that it is a mere

façade concealing the true facts.").

17

"Second, courts may pierce the corporate veil only where special circumstances exist indicating that it is a mere façade concealing the true facts." *Tyson*, 433 B.R. at 87; *accord* 14 Halsbury's Laws of England ¶ 121 (5th ed. 2009).  Evidence of impropriety is a necessary condition to justify veil-piercing, but impropriety on its own is insufficient; the impropriety must be linked to the use of the company structure to avoid or conceal liability.  *Tyson*, 433 B.R. at 87; *accord Ben Hashem*, [2008] EWHC (Fam) 2380, [161]-[162] ("[T]he corporate veil can be pierced only if there is some 'impropriety' . . . .  [T]he court cannot . . . pierce the corporate veil merely because the company is involved in some impropriety.  The impropriety must be linked to the use of the company structure to avoid or conceal liability.").

"Third, where a corporate structure is interposed for the purpose of shielding a defendant from liability . . . , the plaintiff's ability to recover from the defendant on a veil-piercing theory turns on whether the defendant had already incurred some liability to the plaintiff at the time he interposed the corporate structure." *Tyson*, 433 B.R. at 88; *accord* 14 Halsbury's Laws of England ¶ 121 (5th ed. 2009) ("Nor is the court entitled to lift the veil as against a company which is a member of a corporate group merely because the corporate structure has been used so as to ensure that the legal liability (if any) in respect of particular future activities of the company will fall on another member of the group rather than the defendant company.").  The distinction in this principle is one between a defendant using a corporate structure to evade rights of relief others already possess against him and a defendant who uses a corporate structure to evade rights of relief others may possess against him in the future.  *Tyson*, 433 B.R. at 88.

These principles militate toward concluding that FR8 has not stated a claim on which relief can be granted.  FR8 alleges that (1) Albacore had inadequate capitalization; (2) it intermingled its funds with the Prime Defendants' funds; (3) there was an overlap in ownership

between the Prime Defendants and Albacore; (4) the Prime Defendants and Albacore had an overlap in personnel; (5) the Prime Defendants and Albacore shared office space; (6) Albacore is a "shell" company under the umbrella of the Prime Defendants; and (7) Prime paid some of Albacore's debts. (*See* Pl.'s Opp'n at 8-9; Compl. ¶¶ 17-51.) Even taking all of these allegations as true, however, they plead at most that the Prime Defendants owned and controlled Albacore and that Albacore was set up to evade future possible liability arising from its ownership of the Overseas Reginamar or the execution of the MOA. They do not plead that impropriety was linked to the corporate structure of Albacore under the second principle outlined above. Nor do they make an allegation that FR8 had a right of relief against the Prime Defendants at the time Albacore was created, so the third principle stated above also weighs against entertaining a veil-piercing claim. Thus, in a case with facts indicating even less corporate separateness than this one, "even though the subsidiary had no function other than to issue . . . bonds [back to the parent], had no separate management, had no bank account at all, kept no records, and had a low amount of capital," an English court refused to pierce the corporate veil because "there was no deception or allegation of intentional wrongdoing on the part of the defendant." Sandra K. Miller, *Piercing the Corporate Veil Among Affiliated Companies in the European Community and in the U.S.: A Comparative Analysis of U.S., German, and U.K. Veilpiercing Approaches*, 36 Am. Bus. L.J. 73, 116 (1998).

FR8 cites *Kensington Int'l Ltd v. Republic of Congo*, [2005] EWHC (QB) 2684, [185], [187], and *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 453 F. Supp. 2d 633 (S.D.N.Y. 2006), to support its contention that Albacore was a mere façade. But both of those cases accord with the third principle covered in *Tyson*; to pierce the corporate veil under English law on the theory that a company was set up to evade liabilities, the liabilities at issue must be

existing at the time of the transaction in question.  *See Presbyterian Church*, 453 F. Supp. 2d at 683 ("English courts find that a corporation is a façade when a subsidiary is established as a mere device for the purpose of evading existing obligations to other parties."); *Kensington*, [2005] EWHC (QB) 2684, [187] ("[T]ransactions or structures, which have no legal substance, and which are set up with a view to defeating existing claims of creditors against the entity responsible for setting up those transactions or structures and lying behind them, can, if they are purely a sham and a façade, be treated by the court as lacking validity.").  FR8 quotes five paragraphs of its complaint that show that Albacore was incorporated after the buyers' board of directors had approved the MOA and concludes that "[i]n such circumstances, Albacore was a 'sham' or 'façade' created expressly for the purpose of shielding Prime from its existing obligations as 'Buyers.'"  (Pl.'s Opp'n at 7.)  But the MOA was not even signed until April 14, 2008, twelve days after Albacore's incorporation.  FR8 also does not specify what these "existing obligations" were at the time of Albacore's incorporation.[2]  FR8's complaint might allege that the Prime Defendants controlled Albacore, but it does not show that Albacore was set up to evade existing liabilities.  FR8's argument is therefore unavailing.

Accordingly, FR8 has failed to state a claim for veil-piercing and this action must therefore be dismissed.

---

[2] FR8 also asserts that "Prime incorporated an assetless shell company for this transaction to defeat creditors – namely FR8."  (Pl.'s Opp'n at 7.)  But FR8 cites only to the statement of its counsel at oral argument on the first motion to dismiss for this proposition.  This does not suffice to defeat a motion to dismiss.

## CONCLUSION

For the foregoing reasons, the Court DENIES plaintiff's motion for reconsideration

**[10cv1862: 31]** and GRANTS defendants' renewed motion to dismiss **[10cv1862: 35, 10cv8083:**

**7, 11]** this action.  Plaintiff's motion for a certificate of appealability is DENIED as moot.  The

Clerk of the Court is requested to close these cases.


SO ORDERED.

Dated: New York, New York
     April 14, 2010

                             Richard J. Holwell
                        United States District Judge